## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| ROBERT LANG and STEPHEN CONGDON, | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | Case No. _____ |
| v. | ) ) | |
| THE CITY OF PORTLAND, | ) ) | |
| Defendant. | ) | |

## COMPLAINT
## AND REQUEST FOR JURY TRIAL AND INJUNCTIVE RELIEF

NOW COME the Plaintiffs, Robert Lang and Stephen Congdon (collectively, the "Plaintiffs"), and make the following complaint against the City of Portland ("the City").

### Nature of Action

1. This is an action under Title I of the Americans With Disabilities Act of 1990, as amended ("ADA"), the Americans with Disabilities Act as Amended ("ADAAA"), the Age Discrimination in Employment Act ("ADEA"), the Maine Whistleblower Protection Act ("WPA"), Rehabilitation Act (the Rehab Act"), and the Maine Human Rights Act ("MHRA"), to correct and remedy unlawful employment practices on the basis of disability and age and to make whole and compensate the Plaintiffs.

2. The Plaintiffs worked at the Portland Jetport for years as maintenance workers until they were singled out for repeated comments about their ages and suggestions that they retire, and both were held to a higher and different standard of performance than the City's younger maintenance workers. When the City's agents were unsuccessful in pressuring the Plaintiffs to retire, the City manufactured reasons to send Plaintiffs to "doctors-for-hire" to get medical examinations they did not need based on exaggerated and falsified facts provided by the

City.  When these biased and illegal medical examinations predictably determined that the Plaintiffs could not perform their jobs as maintenance workers, the City forced Mr. Lang to take a lower-paid position elsewhere in the City and fired Mr. Congdon entirely.  This action follows.

## Parties

3.     Plaintiff Robert Lang is a 68-year-old citizen of the State of Maine, living in the town of Buxton, County of York.

4.     Plaintiff Stephen Congdon is a 67-year-old citizen of the State of Maine, living in the town of Shapleigh, County of York.

5.     The City is a duly-organized entity of local government under Maine law.

6.     The City has had more than 500 employees for each working day in each of 20 or more calendar weeks in the same calendar year as, or in the calendar year prior to, when the discrimination alleged in this case occurred.

## Jurisdiction and Venue

7.     This court has jurisdiction of the federal claims asserted here pursuant to 28 U.S.C. §§ 1331 and 1343. This court has supplemental jurisdiction over the claims in this action arising under the law of the State of Maine pursuant to 28 U.S.C. § 1367.

8.     The unlawful employment practices complained of in this complaint principally occurred, and the employment records relevant to this matter are maintained and administered, within Cumberland County, Maine, and venue is proper within this District.

9.     Plaintiffs each timely filed a complaint with the Maine Human Rights Commission ("MHRC"), which was dual filed with the Equal Employment Opportunity Commission ("EEOC").

10.     Plaintiffs have exhausted all of their administrative remedies.

11.     Mr. Congdon has satisfied the requirements of 5 M.R.S. § 4622.  Prior to filing this action, the MHRC issued a right to sue letter to Mr. Congdon on November 27, 2018, pursuant to 5 M.R.S. § 4612(6).

12.     The EEOC issued a right to sue letter to Mr. Congdon on December 11, 2018.

13.     Mr. Lang has satisfied the requirements of 5 M.R.S. § 4622.  Prior to filing this action, the MHRC issued a right to sue letter to Mr. Lang on November 27, 2018, pursuant to 5 M.R.S. § 4612(6).

14.     The EEOC issued a right to sue letter to Mr. Lang on November 28, 2018.

**Jury Demand**

15.     Plaintiffs demand trial by jury on all claims to the extent allowed by law.

**Factual Background**

16.      The City operates the Portland International Jetport (the "Jetport") in Portland, Maine.

17.     Until their employment at the Jetport was unlawfully ended, Plaintiffs worked for the City at the Jetport as Airport Maintenance Workers.

18.     The duties and responsibilities of Airport Maintenance Workers for the Jetport include things like cutting grass, plowing snow, managing birds and wildlife, filling ruts, painting lines, escorting people/vehicles/planes around the airport, repairing gates and locks, fixing runway and taxiway lights, removing brush, repairing signs, doing inspections of the fields and runways, repairing holes in fences, marking and painting drains, and other maintenance work.  From time to time, Airport Maintenance Workers are also asked to do work inside the terminals, such as inspecting the building, repairing or replacing toilets or water fountains, replacing lightbulbs or tiles or doors, fixing leaky pipes, plowing the roads and salting, moving furniture, inspecting the boilers, weed whacking, cutting grass, trimming trees and cleaning the maintenance building.

19.     Pursuant to their employment at the Jetport, Plaintiffs were members of AFSCME Local 481-00.

20.     An "incursion" is what the Jetport calls it when a person gets onto an "active" runway without the tower's permission.  It's not necessarily the case that a plane is taking off or landing for a runway to be "active."   It's a designation by the tower.

21.     At a meeting during the summer of 2016, the Jetport's Director, Paul Bradbury, stated that there had been 18 incursions at the Jetport.

22.     On information and belief, approximately seven of those incursions were made by maintenance workers like Plaintiffs.  In addition, Brad Wallace, Airport Operations Manager, had one incursion.  Artie Sewall, Airfield Maintenance and Construction Manager, also had one incursion.

23.     The Jetport's longstanding practice has been that an employee is only terminated after his or her third incursion.

**A.     The Facts Related to Robert Lang's Claims against the City**

24.     Mr. Lang began working for the City at the Jetport as an Airport Maintenance Worker II (Grade 16) in April, 2003.  He was promoted to Airport Maintenance Worker III (Grade 18) in October, 2003, in recognition of his performance.  Mr. Lang was later promoted to Grade 19 and third shift lead.

25.     Over the course of his fourteen years working in maintenance for the City and until the events complained of herein occurred, Mr. Lang received consistently high reviews on his performance.  Mr. Lang never once completed an airfield inspection incorrectly because, if he had, it would have been returned to him, and he would have been questioned about it.  He never was.

26.     Brad Wallace was one of Mr. Lang's supervisors.

27.    In 2016, when Mr. Lang was 66-years-old, Mr. Wallace began making comments about Mr. Lang's age and pressing Mr. Lang about when he would retire.

28.    For example, in April, 2016, a number of Jetport employees had to take a test to keep their driving status up, part of which was on the computer, and part of which was written. Mr. Lang had learned that day that his wife had breast cancer, but he took the test anyway. Mr. Lang missed approximately 3-4 questions out of about 150. Brad called Mr. Lang into his office and asked why he missed the questions. Mr. Lang explained that he had just learned about his wife's cancer diagnosis, so he wasn't really thinking right. Brad's response was "Are you sure it was that and not the fact you can't remember things at your age?"

29.    A short while later, Mr. Lang re-took this exam and scored perfectly—without a single mistake.

30.    In June, 2016, Mr. Lang was conducting an airfield inspection when he was told by the tower to do three things: cross runway 29, proceed on C South, get on runway 36 and hold short of 29 on 36. Mr. Lang accidentally went onto runway 36 before getting additional permission from the tower, which qualifies as an incursion. Brad later said in a meeting in front of many of the Jetport's mechanics that this incursion was actually the tower's fault because they should not have given Mr. Lang that many instructions at once.

31.    Consistent with Jetport practice, Mr. Lang was allowed to continue to inspect the airfield and perform his other job duties after receiving the June, 2016, incursion, which was his first ever.

32.    In the fall of 2016, Brad took Mr. Lang out for a ride along training test on the airport grounds. At the first set of signs at the Hold Short Taxiway, Brad told Mr. Lang to describe all six signs, which he did. Then Brad looked at Mr. Lang and said "Say them all fast. Say them five times fast. If you can't, I don't need you to work here." Then he said, "Bob, how old are you, why don't you retire? Aren't you too old to do this job? I don't think you're going to

5

work out for us anymore." Mr. Lang was not aware that anyone else was asked to repeat the signs five times fast—just him. Mr. Lang did as asked, but Brad then told Mr. Lang to go back to the shop because it was useless to go on with the test. Brad wouldn't let Mr. Lang finish the test, even though there was no legitimate reason why he should have stopped it.

33.     Because Brad would not let Mr. Lang complete the test, Mr. Lang was not cleared to drive on the airport's runways or taxiways, or do inspections. This meant that Mr. Lang could no longer work alone, so he could not get overtime at night or holidays, which he historically earned a lot of. This reduced Mr. Lang's pay substantially.

34.     About a week after the ride along test, Brad came into the break room and asked Mr. Lang, unprompted, *again* how old he was. Mr. Lang said "Brad, I'm 66 years old and you already know that." Brad then asked *again* why Mr. Lang wouldn't retire. Mr. Lang said "When I'm ready, you'll be the first to know," and walked out.

35.     Two or three weeks after the ride along with Brad, Mr. Lang went out again with Brad, as well as another employee, Jeff DeMille. At the first Hold Short Position, he asked Mr. Lang to read all six signs. Mr. Lang called one sign a taxiway sign instead of a taxiway *location* sign. Brad completely lost his temper and yelled at Mr. Lang to get out of the van and let Brad drive. Brad said that Mr. Lang **would never pass the test and that he was too old for his job**. Jeff DeMille witnessed Brad's outburst and confirmed that Brad made these comments about Mr. Lang and his age. Mr. Lang was mortified.

36.     Shortly thereafter, Mr. Lang was in a van with Brad, Mike Chevarie, and Aaron Keller, and they were driving around the Perimeter Road at the airport. Mr. Lang was talking about seeing a large coyote the other night when he momentarily blanked on the word coyote and said "You know, that big dog." Aaron said "You mean coyote?" Mr. Lang said yes.

37.     The City later used this incident as a justification for forcing Mr. Lang to undergo a psychiatric exam even though it's normal for everyone, at *any* age, to blank on a word from

time to time.  Mr. Lang saw other mechanics have "brain farts" all the time, and they weren't made to go see a doctor.

38.     In fact, Brad Wallace was once driving at the airport and asked Mr. Lang to go get a plow truck—*forgetting that Mr. Lang was directly behind him driving a plow truck*.  On information and belief, Brad has never been forced to undergo a psychiatric exam because he forgets things or makes mistakes from time to time.

39.     Mr. Lang then went for another ride-along test, but this time he did it with the other Airport Operations Manager, Aaron Keller.  He had the same position as Brad.  Mr. Lang was allowed to take the entire test and got it 100% right.  Mr. Lang asked Aaron to pass him, but Aaron said that Brad had to do it—even though Brad made it clear that he would never clear Mr. Lang no matter what because he thought Mr. Lang was too old.

40.     Indeed, Mr. Lang went on 3-4 ride alongs with other maintenance workers who had to take the same road test—all of whom were younger than him.  Brad treated these younger workers much better than he treated Mr. Lang when they made a mistake.  He gave them more time to study during the day and was nicer about them failing and gave them opportunities to retake the test.

41.     On information and belief, younger maintenance workers made mistakes during their road tests like Mr. Lang did or made even more mistakes, and Brad passed them.

42.     Mr. Lang told Brad he wanted to do the road test again but this time with a witness, Matthew Hermann, so that others would see how he was being treated.  Mr. Lang, Brad and Matt went out for the road test again, and Mr. Lang *completed the test perfectly*.  After passing the road test, when they were driving back to the shop, out of nowhere Brad pointed to a building that is not on the airfield or part of the test and asked Mr. Lang to name it.  Mr. Lang said the building was "Inland" because that's what it says on the side of the building and how he knew the company.  Brad then said he wanted the whole name of the company "or I cannot use

you at this airport." No one else was asked to complete additional, unnecessary and unrelated test questions after passing their road test, just Mr. Lang.

43.   After passing the ride along, Mr. Lang went up to Brad's office to have him sign off on the paperwork so Mr. Lang could go back to doing his job. Even though Mr. Lang passed the test, Brad said that he wouldn't sign off on returning Mr. Lang to work. Brad then brought up Mr. Lang's age *again* and said "Bob, how old are you, don't you want to retire? How long are you going to play this out?" Mr. Lang told Brad "You know how old I am. You have my records and Steve Congdon's records right on your desk. ***I know what this is about. It's about age discrimination and you have done the same to me as you've done to Steve***." Brad just said "I'm done," and walked away.

44.   On October 25, 2016, Mr. Lang filed a grievance with the City for age discrimination.

45.   Also on October 25, 2016, *after receiving his grievance and noting that it had been filed*, Brad sent an email to the Jetport management citing the coyote incident, the Inland pop quiz and an occasion when Mr. Lang misidentified a bird 200 yards away as reasons for believing that Mr. Lang was too unsafe to drive anywhere at the Jetport even though "other maintenance personnel have 'drawn a blank' from time to time…and am sure that I [Brad] have done so as well."

46.   On October 27, 2016, Mr. Lang was told he could no longer drive anywhere any more or even sit in the passenger seat during an inspection at the Jetport because they didn't trust Mr. Lang. This was after he passed every *legitimate* test the Jetport had given him.

47.   In early November 2016, Mr. Lang was told that he had to go to a neuropsychologist named Dr. Howard Kessler or he'd be fired, so Mr. Lang did it. The medical exam was not limited to things relevant to Mr. Lang's job. Dr. Kessler asked questions about things related to how Mr. Lang's mother delivered him, his parents' marital relationship, Mr.

Lang's grades in high school, the fact that his daughter was going to get married and the fact that Mr. Lang likes to shoot but not hunt.  None of that was relevant to whether Mr. Lang can work as a maintenance worker at the airport plowing snow or cutting grass.  When Mr. Lang got a copy of Dr. Kessler's report, it stated that it was based, in part, on allegations from the very person who had been harassing Mr. Lang about his age for months and treating him in a discriminatory manner—Brad.

48.     As a result of the misleading and improper information, *inter alia*, Dr. Kessler's report indicated that Mr. Lang suffers from "mild neurocognitive disorder" and "post traumatic stress disorder".

49.     On January 5, 2017, a doctor-for-hire paid by the City reviewed Dr. Kessler's report and Brad's problematic allegations but didn't bother to actually see Mr. Lang before he determined that Mr. Lang should not return to his position.

50.     Mr. Lang's physician, who has actually seen and examined him, did not impose any work restrictions on Mr. Lang.

51.     Mr. Lang was then assigned to work in front of the terminal and inside the terminal, which significantly reduced his pay.

52.     In a meeting on April 26, 2017, Mr. Lang was told that he had to accept a different job for the City working at the Barron Center—a nursing home—or he would be fired. The City alleged that Mr. Lang was unable to do his job.  Mr. Lang said that there was nothing wrong with the way he did his job at the Jetport, and this was nothing more than age discrimination.  Tom Caiazzo (Head of HR for the City) said the City had a doctor's report, which says that Mr. Lang can't plow because he gets disoriented and loses awareness of where he is, which is a "safety issue."  Neither doctor's report actually says that.

53.     Moreover, Mr. Lang had been plowing in front of the airport all winter, where there were people and cars moving around all the time.  If he was so dangerous that he got

disoriented and lost awareness of where he was, why would the City have assigned him to plow there?  The answer is because it wasn't actually true.

54.     In the April 26th meeting, Mr. Lang learned that, if he took the Barron Center job, he would earn a lot less money.  Prior to the City's illegal conduct, Mr. Lang had historically earned between 14,000 - $18,000 a year in overtime on the airfield.  He wouldn't get overtime or holiday pay at the Barron Center.  In addition, he would be demoted from a Maintenance Worker III at a 19 rating at the Jetport to a Maintenance III with a rating 18 at the Barron Center, which is a difference in pay of about $1.25 per hour **less** than he was making.

55.     Because he needed a job and because he was told he would be fired if he didn't take it, Mr. Lang reluctantly agreed to take the position at the Barron Center, where he continues to work.

**B.     The Facts Related to Stephen Congdon's Claims against the City**

56.     Mr. Congdon began working for the City as an Airport Maintenance Worker on April 12, 2012, after working for approximately 17 years at Pease International Airport.

57.     On November 15, 2012, Mr. Congdon was promoted to Airport Maintenance Worker III, retroactive to October 12, 2012, in recognition of his successful work performance and completed trainings.

58.     On May 10, 2013, Mr. Congdon was promoted to third shift lead in recognition of his performance and training accomplishments.

59.     In 2014, Mr. Congdon started working on the second shift, which goes from 3:00 p.m. to 11:30 p.m.

60.     In November 2015, Mr. Congdon had two open heart surgeries and was out on medical leave.

61.     While he was on medical leave, Mr. Congdon was moved from the second shift to the third shift without his agreement.

62.     On April 26, 2016, Mr. Congdon's doctor faxed the City a letter stating that Mr. Congdon could come back to work although he needed an evaluation by a cardiologist first. The letter also requested an accommodation for Mr. Congdon to work the second shift, instead of the third shift, due to the effects on Mr. Congdon's health from having to work overnight.

63.     On May 31, 2016, Mr. Congdon's doctor faxed the City another note, this time indicating that Mr. Congdon could return to work on July 1, 2016, as he would have completed his cardiac rehab and physical therapy at that time.

64.     In June, 2016, Mr. Congdon had a call with Brad and HR about returning to work. Mr. Congdon repeated his request for an accommodation on this call, and his request angered Brad, who got upset and angrily accused Mr. Congdon of trying to "strong arm" him.  Brad told Mr. Congdon that if he didn't return to work on July 1st on third shift at full duty, he wouldn't have a job.  Brad refused to discuss anything other than Mr. Congdon returning to full duty and on third shift.

65.     Mr. Congdon needed his job, so he decided he would come back to work for the City on third shift.

66.     On July 1, 2016, Mr. Congdon returned to work, and Brad began retaliating against him right away.  To wit, Brad treated Mr. Congdon poorly on his first night because Brad—apparently lacking a sense of irony—was mad that he had to come in on the third shift to give Mr. Congdon an FAA exam, when Mr. Congdon requested not to work the third shift either.

67.      After he came back to work, Mr. Congdon went out on a FAA field inspection with Brad on the third shift.  After failing a new test, he told Brad he was struggling with remembering everything because he had been out of work for 8 months and being forced to work the night shift was negatively affecting his memory—just like his doctor said it would. Brad became upset and said that if guys like him and Mr. Lang didn't start to "get it," they

weren't going to have jobs anymore.  Mr. Congdon understood that to be a comment about their

ages because both of them are older.

68.     On this test, Mr. Congdon missed about 6 questions out of 50-60 because he

couldn't remember some of the technical names of some of the markings—some of which had

changed.   He still knew what everything meant, though.

69.     After this failed test, Brad went out of his way to be disrespectful and snapped at

Mr. Congdon in front of other employees.  He didn't treat younger employees who failed the

test the same way.

70.     In July, 2016, Brad and Mr. Congdon were driving on the airfield with another

employee and doing practice FAA inspections at 2:00 a.m. when the air control tower was

closed.  No flights are going in or out.  While they were practicing, Mr. Congdon radioed the

common traffic air frequency (CTAF), as if he was calling the tower.  CTAF alerts any pilots

nearby that there is a maintenance vehicle in the movement area.  Normally, they were supposed

to radio the tower when they were crossing to leave the airfield and sit there until they got

permission from the tower.  Since no one was around and the tower was closed, no one could

give him permission to go, he radioed CTAF at the right spot, slowed down, but didn't wait for

a response before continuing off the airfield.  Right after they left the airfield, Brad then started

screaming and told Mr. Congdon to 'GET IN THE BACK' of the van.  It was a completely

inappropriate reaction, and Brad was much harder on Mr. Congdon than younger employees

who made bigger mistakes.  He took Mr. Congdon off driving duties because of this incident.

71.     Brad must have lied about and exaggerated this incident because an inaccurate

version of these events was used to force Mr. Congdon to undergo an illegal medical exam:

Recently, Mr. Congdon has been behaving in a manner inconsistent with the policies of the City. During a recent driver training session on the airfield with his supervisor, he was told that he must ask permission from the air traffic control tower (ATC) to cross a certain boundary in order to exit the airfield. When he was reminded of this, he replied words to the effect that he was not on the airfield. At this point, the supervisor became uncomfortable with his operation of the vehicle. *(Not requesting permission from the ATC may result in a serious FFA violation; even worse could be the cause of a catastrophic incident with an aircraft).* When questioned later about the incident, by his supervisor, Mr. Congdon stated that he has good and bad days. At this point Mr. Congdon was taken off driving duties.

72.     Missing from this report was the fact that the ATC was closed, meaning no one could have contacted them. The way that Brad wrote this incident up purposefully made it sound much worse than it actually was. Similarly, Mr. Congdon told Brad they weren't on the airfield *because they were no longer on the airfield* when Brad started screaming. Mr. Congdon knew exactly where he was and identified it correctly. Mr. Congdon never said he has good days and bad days, although every single human being could say that.

73.     From that point on, Brad made numerous comments to Mr. Congdon about his age, including asking him how old he was and when Mr. Congdon was going to retire. He didn't ask the many younger employees who failed exams this question. Mr. Congdon's age was none of Brad's business.

74.     On September 23, 2016, Mr. Congdon was placed on administrative leave pending a "fit for duty" exam he didn't need, based on false and misleading statements by Brad, including the GET IN THE BACK incident. Mr. Congdon again asked to be put on the second shift instead, and this request was denied without any discussion.

75.     Mr. Congdon did not think he needed to go for any medical exam, but he agreed so that he could keep his job.

76.     On October 3, 2016, Mr. Congdon saw a doctor from Concentra, who did a very quick physical medical exam and asked why the City had sent him. Mr. Congdon reported that the City sent him because it felt Mr. Congdon had memory problems. Mr. Congdon told

Concentra's doctor that he was still recovering from surgery, and the City had refused to put

him on anything but the night shift, so he was suffering from sleep deprivation as a result. The

doctor then made the statement that *the doctor's* memory wasn't as good as it used to be

because he was 65 now. The doctor didn't ask Mr. Congdon many questions, and they didn't

talk about his job duties. It didn't seem as if he knew what Mr. Congdon's job duties were.

There was no psychological testing.

77.     Based on this exam, Concentra's doctor stated that Mr. Congdon had no

restrictions but was "unable to perform essential functions" of his job. There was no way the

doctor could know that from the minimal exam he did with the minimal information he had.

The doctor also said Concentra needed Mr. Congdon's *entire* medical file from his primary care

physician, which was not legal.

78.     On November 3, 2016, the City forced Mr. Congdon to go see the same

neuropsychologist that Mr. Lang saw, or Mr. Congdon would be fired.

79.     The neuropsychologist based his opinion, in part, on Brad's lie about the GET IN

THE BACK incident. In addition, the exam was not limited to things relevant to Mr.

Congdon's job. The neuropsychologist asked questions about Mr. Congdon's private sexual

activities, when was the last time he cried, his fear of spiders, the time he was fired from being a

dishwasher in high school and *asked when he planned to retire*. None of this was relevant to

whether Mr. Congdon could plow snow or cut grass. Asking about his plan for retiring was

about his age, not his job.

80.     Concentra's doctor reviewed the neuropsychologist's report and recommended

that Mr. Congdon not return to work without restrictions (even though his exam said Mr.

Congdon had no restrictions). Concentra's doctor recommended that the City "obtain and

adhere to" any work restrictions by Mr. Congdon's doctors, which was frustrating because Mr.

14

Congdon had already given the City his doctor's recommendations, which Brad rejected

outright and accused Mr. Condon of trying to "strong arm" him.

81.     On January 10, 2017, Mr. Congdon had a hearing to determine whether he was

medically capable of performing the essential functions of an Airport Maintenance Worker.  At

this hearing, the City decided to terminate Mr. Congdon, in part based on the illegal medical

exams.  Mr. Congdon asked to be accommodated by being allowed to perform other duties at

the airport like plow the entrance roads, or do repair calls at the terminal.  The City said 'No'

and didn't discuss any other options or accommodations that would allow Mr. Congdon to keep

his job or offer to allow him to move to another position, like Mr. Lang had done.

82.     On January 27, 2017, Mr. Congdon was fired from the Jetport and the City.

83.     After Plaintiffs were terminated, the City made the decision to no longer have its

maintenance workers perform airfield inspections.  These are now performed by other Jetport

employees.  Any concern—however illegitimate—the City had about either Mr. Lang or Mr.

Congdon performing these inspections is now gone.  Both gentlemen could return to their

positions.  This fact is also evidence that such an accommodation was possible prior to Plaintiffs

losing their positions.

## COUNT I:
## Age Discrimination under the ADEA, 29 U.S.C. § 621 *et seq.*

84.     Plaintiffs incorporate and reallege the above paragraphs as if fully set forth here.

85.     Defendant is, and was at all relevant times, an employer in an "industry affecting

commerce" as defined in 29 U.S.C. § 630.

86.     Plaintiffs are and have been over 40 years of age at all times relevant to this

Complaint.

87.     As alleged in more detail in this Complaint, Plaintiffs' work was sufficient to

meet Defendant's *legitimate* expectations.

88.     Defendant, through its duly-authorized agents and employees, who acted on behalf of their employer within the scope of their employment, discriminated and retaliated against Plaintiffs on the basis of their ages as set forth herein, including having their hours and earnings reduced, being forced to undergo illegal medical exams, being reassigned to a lower-paid position and terminated.

89.     The City has a continued need for airport maintenance workers.

90.     Defendant's violations of the ADEA were and are willful violations within the meaning of the ADEA.

91.     As a direct and proximate result of the retaliatory acts and practices of Defendant, its agents and employees, Plaintiffs have suffered and continue to suffer injury, including past and future loss of income and other employment benefits, severe emotional pain and suffering, mental anguish, humiliation, loss of enjoyment of life, costs associated with obtaining reemployment, embarrassment, damage to their reputations, and other past and future pecuniary losses.

## COUNT II:
### Age Discrimination Retaliation under the ADEA, 29 U.S.C. § 621 *et seq.*

92.     Plaintiffs incorporate and reallege the above paragraphs as if fully set forth here.

93.     Defendant discriminated against Plaintiffs because they opposed practices made unlawful by the ADEA as set forth further *supra*.

94.     Defendant discriminated against Plaintiffs by punishing them more harshly than younger similarly-situated employees, yelling at them, demoting them, taking away hours, ordering them to undergo illegal medical exams, forcing Mr. Lang to accept a lower-paid position, and firing Mr. Congdon because they opposed unlawful age-based employment practices.

95.     In addition, Defendant interfered with Plaintiffs' exercise of their rights to be free

16

of age discrimination and to receive promotions and wage increases and continued employment despite their ages.

96.     Plaintiffs were harmed by those actions.

97.     Given Plaintiffs' reports, complaints and grievances of unlawful age-based employment practices and Defendant's swift termination of Mr. Lang after he filed a grievance, the Defendant was well aware of the illegality of its conduct and acted willfully.

98.     As a direct and proximate result of the discriminatory and illegal acts of Defendant, its agents and employees, Plaintiffs have suffered and continue to suffer injury, including past and future loss of income and other employment benefits, severe emotional pain and suffering, mental anguish, humiliation, loss of enjoyment of life, costs associated with obtaining reemployment, embarrassment, damage to their reputations, and other past and future pecuniary losses.

## COUNT III:
## Age Discrimination under the MHRA

99.     Plaintiffs incorporate and reallege the above paragraphs as if fully set forth here.

100.     Plaintiffs are and were at all times pertinent to this action covered by the provisions of the MHRA, 5 M.R.S. § 4551 *et seq.*

101.     Plaintiffs were and are qualified for the airport maintenance worker position at the City's Jetport, and they satisfy the skill, experience, and other job-related requirements for the position.  Plaintiffs were and are able to perform the essential functions of the position.

102.     Defendant, through its duly-authorized agents and employees, who acted on behalf of their employer within the scope of their employment, intentionally discriminated against the Plaintiffs based on their ages.

103.     Plaintiffs suffered the adverse employment actions of having their hours and earnings reduced, being forced to undergo illegal medical exams, being reassigned to a lower-paid position and terminated.

104.     The alleged reason for these adverse employment actions was mere pretext for the real reason, namely, the intentional discrimination by Defendant against the Plaintiffs based on their ages.

105.     Defendant acted with malice or with deliberate conduct or in such a manner that, although motivated by something other than ill will toward any particular party, is so outrageous that malice toward Plaintiffs can be implied.  Defendant was also motivated by discriminatory intent.

106.     As a direct and proximate result of the intentional discriminatory acts and practices of Defendant, its agents and employees, Plaintiffs have suffered and continues to suffer injury, including past and future loss of income and other employment benefits, severe emotional pain and suffering, mental anguish, humiliation, loss of enjoyment of life, costs associated with obtaining reemployment, embarrassment, damage to their reputations, and other past and future pecuniary losses.

## COUNT IV:
## Illegal Medical Exam and Inquiry under the ADA and ADAAA and Rehab Act

107.     Plaintiffs reallege and incorporate by reference the allegations set forth in the paragraphs above.

108.     Plaintiffs were employees of the Defendant, City of Portland.

109.     As set forth herein, Defendant made disability-related inquiries of the Plaintiffs and then forced Plaintiffs to undergo medical examinations by Concentra and a neuropsychologist by threat of termination.

110.    Defendant illegally required Plaintiffs to undergo medical examinations that were not job related or consistent with business necessity.  *See* 42 U.S.C. § 12112(d)(4)(A); 29 C.F.R. § 1630.14(c) (A medical exam may only "make inquiries into the ability of an employee to perform job-related functions.").

111.    Defendant illegally inquired into Plaintiffs' disabilities or perceived disabilities because such inquiries were not job related or consistent with business necessity.  *See* 42 U.S.C. § 12112(d)(4)(A).

112.    The disability-related inquiries and medical exams were illegal, as well as evidence of the City's discrimination.

113.    The illegal disability-related inquiries and medical exams were then used to remove Plaintiffs from their positions, demote Mr. Lang and fire Mr. Congdon.

114.    As a direct and proximate result of the discriminatory and illegal acts of Defendant, its agents and employees, Plaintiffs have suffered and continue to suffer injury, including past and future loss of income and other employment benefits, severe emotional pain and suffering, mental anguish, humiliation, loss of enjoyment of life, costs associated with obtaining reemployment, embarrassment, damage to their reputations, and other past and future pecuniary losses.

## COUNT V:
### Illegal Medical Exam and Inquiry under the MHRA, 5 M.R.S. § 4572(2)

115.    Plaintiffs reallege and incorporate by reference the allegations set forth in the paragraphs above.

116.    Under 5 M.R.S. § 4572(2)(D), an employer cannot require an employee to undergo a medical exam "unless the examination or inquiry is shown to be job-related and consistent with business necessity."

117.    Plaintiffs were employees of the Defendant, City of Portland.

118.     As set forth herein, Defendant made disability-related inquiries of the Plaintiffs and then forced Plaintiffs to undergo medical examinations by Concentra and a neuropsychologist by threat of termination.

119.     Defendant illegally required Plaintiffs to undergo medical examinations that were not job related or consistent with business necessity.

120.     Defendant illegally inquired into Plaintiffs' disabilities or perceived disabilities because such inquiries were not job related or consistent with business necessity.  5 M.R.S. § 4572(2)(B).

121.     The disability-related inquiries and medical exams were illegal, as well as evidence of the City's discrimination.

122.     The illegal disability-related inquiries and medical exams were then used to remove Plaintiffs from their positions, demote Mr. Lang and fire Mr. Congdon.

123.     As a direct and proximate result of the discriminatory and illegal acts of Defendant, its agents and employees, Plaintiffs have suffered and continue to suffer injury, including past and future loss of income and other employment benefits, severe emotional pain and suffering, mental anguish, humiliation, loss of enjoyment of life, costs associated with obtaining reemployment, embarrassment, damage to their reputations, and other past and future pecuniary losses.


## COUNT VI:
## Retaliation under the ADA and ADAAA and Rehab Act

124.     Plaintiffs incorporate and reallege the above paragraphs as if fully set forth here.

125.     Plaintiffs were qualified persons with a disability as defined by the ADA and ADAAA, 42 U.S.C. § 12102(1)(B) and (C) because they were regarded as having a disability and had a record of a disability.

126.    Defendant knew of Mr. Congdon's disability because his doctor sent medical notes to the City, and the City regarded Plaintiffs as disabled.

127.    Plaintiffs were and are qualified to be airport maintenance workers at the Jetport despite their disabilities or regarded disabilities, since they satisfy the skill, experience, and other job-related requirements for the position, and since Plaintiffs were and are able to perform the essential functions of the position with or without reasonable accommodation.

128.    Plaintiffs engaged in the protected conduct of requesting light duty, different shifts, and different work at the Jetport and filing suit in the MHRC.

129.    Defendant, through its duly authorized agents and employees, who acted on behalf of their employer within the scope of their employment, retaliated against Plaintiffs for engaging in protected activity as set forth herein, including having their hours and earnings reduced, being forced to undergo illegal medical exams, being reassigned to a lower-paid position and terminated.

130.    Due to the temporal proximity of Plaintiffs' requests for accommodations and their demotions and/or termination, one can infer the causal link between the protected activities and the adverse actions.

131.    Defendant engaged in discriminatory action in the face of a perceived risk that its actions would violate federal law.  Its acts and omissions were done maliciously or with reckless indifference to Plaintiffs' federal protected rights.

132.    As a direct and proximate result of the retaliatory acts and practices of Defendant, its agents and employees, Plaintiffs have suffered and continue to suffer injury, including past and future loss of income and other employment benefits, severe emotional pain and suffering, mental anguish, humiliation, loss of enjoyment of life, costs associated with obtaining reemployment, embarrassment, damage to their reputations, and other past and future pecuniary losses.

## COUNT VII:
## Retaliation under the MHRA, 5 M.R.S. § 4633

133.     Plaintiffs reallege and incorporate by reference the allegations set forth in the paragraphs above.

134.     Plaintiffs were and are qualified to be airport maintenance workers at the Jetport despite their disabilities or regarded disabilities, since they satisfy the skill, experience, and other job-related requirements for the position, and since Plaintiffs were and are able to perform the essential functions of the position with or without reasonable accommodation.

135.     Plaintiffs engaged in the protected conduct of requesting light duty, different shifts, and different work at the Jetport and filing suit in the MHRC.

136.     Defendant, through its duly authorized agents and employees, who acted on behalf of their employer within the scope of their employment, retaliated against Plaintiffs for engaging in protected activity as set forth herein, including having their hours and earnings reduced, being forced to undergo illegal medical exams, being reassigned to a lower-paid position and terminated.

137.     Due to the temporal proximity of Plaintiffs' requests for accommodations and their demotions and/or termination, one can infer the causal link between the protected activities and the adverse actions.

138.     Defendant acted with malice or with deliberate conduct or in such a manner that, although motivated by something other than ill will toward any particular party, is so outrageous that malice toward Plaintiffs can be implied.

139.     As a direct and proximate result of the retaliatory acts and practices of Defendant, its agents and employees, Plaintiffs have suffered and continue to suffer injury, including past and future loss of income and other employment benefits, severe emotional pain and suffering, mental anguish, humiliation, loss of enjoyment of life, costs associated with obtaining

reemployment, embarrassment, damage to their reputations, and other past and future pecuniary

losses.

## COUNT VIII:
## Whistleblower Retaliation under the WPA, 26 M.R.S. § 833(1)(A) (*Mr. Lang Only*)

140.    Plaintiff incorporates and realleges the above paragraphs as if fully set forth here.

141.    Defendant discriminated against Mr. Lang with respect to tenure, transfer,

compensation, terms, conditions or privileges of employment or any other matter directly or

indirectly related to employment because of actions taken by Mr. Lang that are protected under

the WPA, in violation of the MHRA, 5 M.R.S. § 4572(l)(A).

142.    Mr. Lang was singled out for treatment for which non-whistleblowers were

not.

143.    Mr. Lang reported to Defendant what he had reasonable cause to believe

was a violation of state or federal law, including that the Defendant was engaging in illegal

age discrimination under state and federal law.  26 M.R.S. § 833(1)(A).

144.    On information and belief, no one at Defendant took any action to correct their

illegal practices.  26 M.R.S. § 833(2).

145.    Instead, Mr. Lang had his hours cut, pay reduced and was forced to take a

demotion for reporting what he had reasonable cause to believe were illegal practices.

146.    As a proximate result of Defendant's unlawful conduct alleged herein, Mr.

Lang has suffered job loss, lost income, emotional distress, loss of enjoyment of life,

inconvenience, and other pecuniary and non-pecuniary losses.

147.    Defendant's unlawful conduct alleged herein was intentional and undertaken

with malice or with reckless indifference to Mr. Lang's rights.

## COUNT IX:
## Disability Discrimination under the ADA and ADAAA and Rehab Act (*Mr. Congdon Only*)

148.    Plaintiff incorporates and realleges the above paragraphs as if fully set forth here.

149.    Plaintiff was a qualified person with a disability as defined by the ADA and ADAAA, 42 U.S.C. § 12102(1)(B) and (C) because he was regarded as having a disability and had a record of a disability.

150.    Defendant knew of Mr. Congdon's disability because his doctor sent medical notes to the City, and the City also regarded him as disabled.

151.    Defendant, through its duly authorized agents and employees, who acted on behalf of their employer within the scope of their employment, retaliated against Plaintiff for engaging in protected activity as set forth herein, including having his hours and earnings reduced, being forced to undergo illegal medical exams and being terminated.

152.    Plaintiff was and is qualified to be an airport maintenance worker at the Jetport despite his disabilities or regarded disability, since he satisfies the skill, experience, and other job-related requirements for the position, and since Plaintiff was and is able to perform the essential functions of the position with or without reasonable accommodation.

153.    Plaintiff suffered the adverse employment actions of having his hours and earnings reduced, being forced to undergo illegal medical exams, and being terminated.

154.    The alleged reason for terminating the Plaintiff's employment was mere pretext for the real reason, namely, the intentional discrimination by Defendant against the Plaintiff based on his disability or regarded disability.

155.    Defendant engaged in discriminatory action in the face of a perceived risk that its actions would violate federal law.  Its acts and omissions were done maliciously or with reckless indifference to Plaintiff's federal protected rights.

156.    As a direct and proximate result of the intentional discriminatory acts and practices of Defendant, its agents and employees, the Plaintiff has suffered and continues to suffer injury, including past and future loss of income and other employment benefits, severe emotional pain and suffering, mental anguish, humiliation, loss of enjoyment of life, costs

associated with obtaining reemployment, embarrassment, damage to his reputation, and other past and future pecuniary losses.

## COUNT X:
### Disability Discrimination under the MHRA (*Mr. Congdon Only*)

157.    The Plaintiff incorporates and realleges the above paragraphs as if fully set forth here.

158.    Plaintiff is, and was at all times pertinent to this action, covered by the provisions of the MHRA, 5 M.R.S. § 4553-A(1)(C) and (D) because he was regarded as having a disability and had a record of a disability.

159.    Plaintiff was and is qualified to be an airport maintenance worker at the Jetport despite his disabilities or regarded disability, since he satisfies the skill, experience, and other job-related requirements for the position, and since Plaintiff was and is able to perform the essential functions of the position with or without reasonable accommodation.

160.    Defendant knew of Mr. Congdon's disability because his doctor sent medical notes to the City, and the City also regarded him as disabled.

161.    Defendant, through its duly authorized agents and employees, who acted on behalf of their employer within the scope of their employment, retaliated against Plaintiff for engaging in protected activity as set forth herein, including having his hours and earnings reduced, being forced to undergo illegal medical exams and being terminated.

162.    Defendant refused to consider a reasonable accommodation that would allow Plaintiff to work.

163.    Defendant ultimately terminated Plaintiff because it regarded him as having a disability and/or having a record of a disability or disabilities.

164.    The alleged reason for terminating the Plaintiff's employment was mere pretext for the real reason, namely, the intentional discrimination by Defendant against the Plaintiff based on his disability or regarded disability.

165.    Defendant acted with malice or with deliberate conduct or in such a manner that, although motivated by something other than ill will toward any particular party, is so outrageous that malice toward Plaintiff can be implied.  Defendant was also motivated by discriminatory intent.

166.    Defendant discriminated against Plaintiff in violation of the Maine Human Rights Act, 5 M.R.S.A. § 4551 *et seq*.

167.    As a direct and proximate result of the intentional discriminatory acts and practices of Defendant, its agents and employees, the Plaintiff has suffered and continues to suffer injury, including past and future loss of income and other employment benefits, severe emotional pain and suffering, mental anguish, humiliation, loss of enjoyment of life, costs associated with obtaining reemployment, embarrassment, damage to his reputation, and other past and future pecuniary losses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court enter an Order providing as follows:

A.    Enter judgment declaring that the City's practices complained of herein are unlawful as alleged;

B.    Grant Plaintiffs a permanent injunction enjoining the City, its officers, agents, successors, employees, attorneys and assigns and other representatives, and all persons acting in concert with it and at its direction, from engaging in any employment policy or practice which discriminates or retaliates against Plaintiffs;

C.    Order the City to make Plaintiffs whole by providing front pay, appropriate back pay, and reimbursement for health, medical, and other benefits in amounts to be shown at trial;

D.      Order the City to pay Plaintiffs compensatory damages for non-pecuniary losses, including, but not limited to, severe emotional pain and suffering, mental anguish, humiliation, loss of enjoyment of life, costs associated with obtaining reemployment, embarrassment, and damage to their reputations;

E.      Order the City to pay Plaintiffs civil penal damages pursuant to 5 M.R.S. § 4613(2)(B)(7);

H.      Order the City to pay litigation costs and expert witness fees;

I.      Order the City to pay Plaintiffs nominal damages;

J.      Order the City to pay pre-judgment interest, post-judgment interest, and reasonable attorneys' fees to Plaintiffs; and

K.      Grant such additional relief as this Court deems appropriate.


     /s/ Amy Dieterich, Esq.
Amy Dieterich, Esq., Bar No. 5413
Jordan Payne Hay, Esq., Bar. No. 5611
*Attorneys for Plaintiff*
Skelton, Taintor & Abbott
95 Main Street
Auburn, ME 04210
207-784-3200
adieterich@STA-law.com
jphay@STA-law.com


DATED:  January 25, 2019